## Case No. 3,104.

### CONN et al. v. PENN et al.

[Pet. C. C. 496.] [1]

Circuit Court, D. Pennsylvania. April Term, 1818.

RIGHTS OF PROPRIETORS OF PENNSYLVANIA — APPROPRIATIONS—PATENTS—SURVEYS—BOUNDARIES—PRESUMPTION OF PAYMENT — RATIFICATION OF ACT OF AGENT—WAR—ABATEMENT OF INTEREST—FOLLOWING STATE PRACTICE.

1. Title of the proprietaries of Pennsylvania, to the soil of the province previous to the Revolution. The proprietaries had an unquestionable right to dispose of the soil as they might think proper, and to reserve to their own use, such portions as they might select, and in such manner as they might please to prescribe.

2. In what manner parts of the province of Pennsylvania were appropriated by the proprietaries to their private use, as manors, &c. Proceedings under which the manor of Springetsbury was laid off and appropriated by the proprietaries.

3. The courses and distances laid down in a survey, especially if it be ancient, are never, in practice, considered conclusive, but are liable to be materially changed by oral proof, or by other evidence, tending to prove that the documentary lines are those not actually run. Reputed boundaries are often proved by the testimony of aged witnesses, and the hearsay evidence of such witnesses has been admitted to establish such lines, in opposition to the calls of an ancient patent. It is not the lines reported, but the lines which have been actually run by the surveyor, which vest in a patentee the area included in those lines.

[Cited in Clement v. Packer, 125 U. S. 324, 8 Sup. Ct. 914.]

4. When the mistakes of a surveyor are shown by satisfactory proof, courts of law as well as courts of equity, look beyond the patent to correct them. If a mistake is apparent upon the face of a survey, and natural or artificial marks, or the reputation of the neighbourhood, have fixed the boundaries of the land different from those delineated in the survey, a subsequent location is so far affected by the real boundaries, that a court of equity will not permit a title derived under such location, to be set up against the owner of the land intended to have been located by the first survey.

5. A recognition of the acts of an agent by his principal, is equivalent to an original grant of authority.

6. It has always been customary in Pennsylvania, to include in surveys made under grants from the proprietaries, a greater quantity of land than the warrant specified, and to pay for the excess at the same rate as the original quantity was paid for. This custom did not extend to grants of lands within the proprietary manors.

7. Interest on debts due by the citizens of the United States, to the subjects of the king of Great Britain, ceased during the Revolutionary war, and during the war of 1812; but the mere circumstance of war existing between two countries, is not a sufficient reason for abating interest upon the debts due by the subjects of one belligerent, to the subjects of another.

[Cited in Hamilton v. Mutual Life Ins. Co., Case No. 5,986.]

8. A prohibition of all intercourse with an enemy during war, furnishes a just reason for the abatement of interest on debts due to the subjects of the belligerent, until the return of peace.

[Cited in Hiatts v. Brown, 15 Wall. (82 U. S.) 186.]

9. The rule, as to the abatement of interest during war, does not apply when the creditor, although a subject of the enemy, remains in the country of the debtor, or has a known agent residing there, and who is authorised to receive the debt.

[Cited in Ward v. Smith, 7 Wall. (74 U. S.) 453; New York Life Ins. Co. v. Davis, 95 U. S. 429.]

10. A presumption that the purchase money for land has been paid to the proprietaries, cannot arise from length of time, when the claimant of the land does not produce a patent or does not show that a patent was issued for the land.

---

[1] [Reported by Richard Peters, Jr., Esq.]

11. The practice in the courts of Pennsylvania, for the jury to find a special verdict, in a cause where the parties have not legal but have equitable claims, does not apply in the circuit court of the United States, that court having equity powers.

[See note at end of case.]

[In equity. Bill by Daniel Conn, Francis Grove, Isaac Grove, and others against John Penn and William Penn.]

Mr. Ingersoll and Edward Ingersoll, for complainants.

Mr. Rawle, Mr. Binney, and W. Rawle, for respondents.

WASHINGTON, Circuit Justice. This is a suit on the equity side of the court, brought by a number of persons, claiming by various titles equitable estates in the manor of Springetsbury, praying that the defendants, in whom the legal estate in the said manor is vested, may be compelled to convey the same according to their respective interests, upon such terms as the court may deem equitable.[2]

It will be proper, in the first place, to state the title of the proprietaries of Pennsylvania to the soil of the province, previous to the Revolutionary war, and the various acts performed by them or their agents, so far as they are connected with this cause, or have any bearing on the titles asserted by the plaintiffs; and secondly, the titles of the respective plaintiffs, so far as they have been laid before the court.

By the charter of Charles I., to William Penn, dated 4th of March, 1668, he became entitled, in his private and individual capacity, to the fee simple interest in the soil of the province, as well as to the government thereof in his political capacity. Hence it followed, that the proprietary had an unquestionable power to dispose of the soil, in such manner as he might think proper, and to reserve to his own use, such portions as he might select, and in such manner, as he might please to prescribe. But as his individual interest, not less than the policy which directed the grant to him, pointed out the necessity of encouraging the population and settlement of the province, as speedily as possible, the original proprietary, on the 11th of July, 1681, entered into an agreement with those who should wish to become purchasers of land within the province, the effect of which was, to render the proprietary a trustee for such individuals, as should acquire equitable rights to certain portions of land under general or particular promises, or such rules and regulations as he or his agents might, from time to time, establish; and for the sake of certainty, and to render public these rules by which purchasers were to be bound, an office was erected, and rules established for the government of the same, as

well as of those who might incline to obtain rights to unappropriated lands within the province; reserving to the proprietaries, a right to appropriate one-tenth of the province to themselves, for their private and individual use. By force of this agreement (as was said by this court in the case of Penn v. Klyne) all persons complying with the terms thus held out, acquired a right to the proportion of lands thus appropriated, not only against third persons who might thereafter attempt to appropriate the same lands, but even against the proprietary himself, unless he had previously, and by some act of notoriety, evinced his intention to withdraw such land from the general mass of property, and to appropriate it to his own use. As a necessary consequence of this principle, whenever such was his intention, it was made known by a warrant of appropriation, and a survey of the land so withdrawn. This was notice to all the world, that no right to the land thus laid off for the proprietaries, could be acquired by individuals without a special agreement with the proprietaries, which might or might not be on the common terms, as the proprietaries might please. But if before such special appropriation, an individual had, in compliance with the rules of the office, appropriated a tract, within the bounds of that laid off for the proprietaries, by settlement or otherwise, such prior appropriation was to be preferred to the title of the proprietaries, as to that particular tract, but no further.

By the recitals in the warrant from Governor Hamilton to the surveyor general, dated the 21st of May, 1762, which will be more particularly noticed hereafter, it appears, "that for the purpose of appropriating the tenths, as they were called, which the first proprietary by his concessions above mentioned reserved to himself, as well as to his successors, general warrants were regularly issued to the surveyor general, for the time being, by the successive proprietaries, to survey for the said proprietary, 500 acres in every township of 5,000 acres and generally the proprietary one-tenth of all the land laid out, or to be laid out; but that the tracts surveyed, for the proprietaries, had fallen far short of their due proportion." For this reason, probably, as well as for those assigned in the warrant itself, Sir William Keith, the governor of the province, on the 18th of June, 1722, issued a warrant to John French, Francis Worley, and James Mitchell, directing them to cross the Susquehanna, and to survey, mark and locate 70,000 acres of land, in the name and for the use of Springet Penn, which should bear the name and be called the manor of Springetsbury: "Beginning upon the south-west bank, over against Conestogoe creek; thence W. S. W. ten miles; thence N. W. by N. twelve miles; thence E. N. E. to the uppermost corner of a tract called Newbury; thence S. E. by S. along the head line of Newbury, to the southern corner

[2] [The case of Penn v. Klyne, Case No. 10,-937, is published as a note to this case in Pet. C. C. 496.]

tree of Newbury; thence down the side line of Newbury E. N. E. to the Susquehanna; and thence down the river to the place of beginning; and to return the warrant to the governor and council of Pennsylvania." The survey, stated to have been made on the 19th and 20th of the same month was returned to the council on the 21st, according to the following boundaries: "From a red oak, by a run side called Penn's run, marked S. P. W. S. W. ten miles to a chestnut by a run side, called French's run, marked S. P.; thence N. W. by N. to a black oak, marked S. P. twelve miles; thence E. N. E. to Sir William Keith's western corner tree in the woods eight miles; thence along the S. E. and N. E. of Sir William Keith's tract called Newbury to the Susquehanna; and thence along the river side to the place of beginning; containing 75,520 acres. The council being of opinion, as they declared in answer to the governor's communication on the subject, that that board had nothing to do with surveys of the proprietary lands, declined to accept the return of the above survey, nor does it appear that it was ever returned to the land office. It was, however, together with the warrant, and the decision of the council, placed upon the minutes of the proceedings of the governor and council, of which an attested copy is filed as an exhibit in this cause. On the 11th of January, 1733, a commission was issued by Thomas Penn, one of the proprietaries, to Samuel Blunston, which after reciting, that "several persons had lately applied to the proprietaries, for liberty to settle on certain quantities of land to the westward of Susquehanna river, and have obtained licenses for the same, but as no warrants of survey have yet been granted, by which each tract could be exactly bounded, several disputes and differences have arisen between the said claimants;" the commission authorises the said Samuel Blunston, "to hear and determine, in the most just and equitable manner, all such differences and disputes," and it also empowers him, "to give licenses unto such persons as should apply to him for settlements in those parts, under such regulations, as to him should seem necessary." By virtue of this commission, Blunston granted licenses to a number of persons, to take up certain specified tracts of land on the west side of the Susquehanna; and among others to Michael Springle for 500 acres in Manchester and Codorus townships.

The Indian title to the lands on the west side of the Susquehanna, having been extinguished by a treaty, on the 11th of October 1736, Thomas Penn, on the 30th of the same month, granted to fifty-two persons, what have been termed licenses; which after reciting "that sundry Germans and others had seated themselves on the west side of the river Susquehanna, within the county of Lancaster, and within the boundaries of a tract of land surveyed on the 19th and 20th days of June 1722, containing about 70,000 acres, commonly called the manor of Springetsbury, and that a confirmation to the persons seated on the same for their several tracts, had been delayed by reason of the claims of the Indians to the land, and that they had applied for a confirmation of their title to the lands; it proceeds to certify, that he will order a patent to be drawn to the several persons for a certain number of acres, on the common terms other lands on the west side of the Susquehanna river were granted, as soon as the quantity specified shall be surveyed out of the abovementioned tract, and a return thereof made." The appropriation of the country on the west side of the Susquehanna, by settlements and under warrants of various denominations, which took place after the extinguishment of the Indian title, and the difficulties likely to ensue at a future period, in consequence of the loss of the plot and survey of this manor, made under the above warrant, of 1722, suggested to Governor Hamilton, the necessity of having the manor again surveyed, and the boundaries thereof ascertained and perpetuated. For this purpose, he, on the 21st of May 1762, issued a warrant of re-survey, directed to the surveyor general, which after setting forth "that in pursuance of the primitive regulations, for laying out lands in the province, W. Penn had issued a warrant, dated the 1st of September 1700, to Edward Pennington, the surveyor general, to survey for the proprietor, 500 acres of every township of 5,000 acres; and, generally, the proprietary one-tenth of all lands laid out, and to be laid out; that like warrants had been issued by the successive proprietaries, to every succeeding surveyor general; that the tracts surveyed, however, are far short of the due proportions of the proprietary; that, therefore, by order of the then commissioners of property, and in virtue of the general warrant aforesaid to the then surveyor general, there was surveyed, for the use of the proprietor, on the 19th and 20th of June 1722, a certain tract of land, situate on the west side of the river Susquehanna, then in the county of Chester, afterwards of Lancaster, and now of York, containing about 70,000 acres, called and now well known by the name of the manor of Springetsbury; that sundry Germans and others afterwards seated themselves, by leave of the proprietor, on divers parts of the said manor, but confirmation of their titles was delayed on account of the Indian claim; that on the 11th of October 1736, the Indians released their claim, when (on the 30th of October 1736) a license was given to each settler, (the whole grant computed at 12,000 acres,) promising patents after surveys should be made; that the survey of the said tract of land is either lost, or mislaid; but that from the well known settlements and improvements, made by the said licensed settlers therein, and the many surveys made round the said manor, and other proofs and circumstances, it ap-

pears that the said tract is bounded E. by the Susquehanna; W. by a north and south line, west of the late dwelling plantation of Christian Elstor, called Oyster, a licensed settler; N. by a line nearly east and west, distant about three miles north of the present great roads, leading from Wright's ferry through York-Town by the said Christian Oyster's plantation to Monockassy; S. by a line near east and west, distant about three miles south of the great road aforesaid; that divers of the said tracts and settlements within the said manor, have been surveyed and confirmed by patents, and many that have been surveyed remain to be confirmed by patents, for which the settlers have applied; that the proprietor is desirous, that a complete draft, or map, and return of survey of the said manor shall be replaced and remain for their and his use, in the surveyor general's office, and also in the secretary's office; that by special order and direction, a survey for the proprietor's use was made by Thomas Cookson, deputy surveyor, (in 1741,) of a tract on both sides of the Codorus, within the said manor, for the site of a town, whereon York-Town has since been laid out and built, but no return of that survey being made, the premises were re-surveyed by George Stevenson, deputy surveyor (in December 1752) and found to contain 436½ acres." After this recital, the warrant directed the surveyor general "to re-survey the said tract, for the proprietor's use, as part of his one-tenth, in order that the bounds and lines thereof, may be certainly known and ascertained." Under the authority of this warrant, a survey of the manor of Springetsbury was made, from the 12th to the 30th of June 1768, and was returned into the land office, and also into the secretary's office on the 12th of July 1768, containing 64,520 acres. As to the act of the assembly of Pennsylvania of 1779, vesting the estates of the late proprietaries in the commonwealth, and its effect in this cause, the court refers to what was said in Penn v. Klyne [Cases Nos. 10,935 and 10,937].

The claims of the complainants, have been arranged by their counsel under the six following heads, and one or two cases have been presented, under each head, to exemplify the titles of the others, belonging to each class respectively: 1. Those who claim under licenses issued by Samuel Blunston. 2. Those claiming under Thomas Penn's grants in 1736. 3. Those claiming under warrants, at the stipulated price of 15l. 10s. per 100 acres. 4. Claimants under warrants, at 9l. per 100 acres. 5. Under applications. 6. Under settlements and improvements, without other title. In order to bring these various cases within the operation of general principles, it will be necessary to arrange them under the following heads: First, those who acquired or purchased titles, upon the common terms applicable to the territorial lands, and yet located themselves within the boundaries of the manor, as ascertained by the survey or re-survey; and, secondly, those who purchased expressly within the boundaries of the manor.

First. The broad ground of equity, upon which the claimants under this head must fix their pretensions is, that they acquired their equitable titles without notice of the prior legal title of the proprietary to those lands; and whether they did so or not, must depend upon a view of all the circumstances which have been proved, on either side, to establish or to negative that fact. This in the opinion of the court, constitutes the great difficulty in the cause. The warrant of 1722 is special, and not only describes with tolerable precision the place of beginning, but limits the length of the line, to the westward, to ten miles, and the north and south line, to twelve miles. If this warrant was executed in strict conformity to the terms of it, and such conformity is professed by the return, it would fix the western boundary of the survey, many miles within that of the survey of 1768, and as it is contended by the defendants, to have existed and to have been known, as far back at least as the year 1736. That the putative boundary of this manor, was such as the defendants' counsel contend it was, at the period abovementioned and afterwards, is established by a chain of evidence not to be resisted. This evidence is composed of the licenses granted by Blunston in 1734; Thomas Penn's grants in 1736; the warrants of 1741, for laying out the town of York, within the manor of Springetsbury; the letter of Secretary Peters to Mr. Penn, in the year 1743, in which he speaks of York-Town, as lying nearly midway of the manor; the warrants to agree, and the recitals in the warrant of 1762; and lastly the actual settlements and improvements made by the licensed settlers within the manor, and the surveys made around and adjoining the different lines of the manor, as proved at the hearing of this cause by Mr. Spangler, who made a survey and plot of this manor; the result of all which is, that the reputed boundaries of the manor, from the year 1736, if not from an earlier period, correspond with the survey of 1768. How it happened, that the reputed boundaries of the manor should vary so extravagantly from those mentioned in the warrant of 1722, and the return, is a question of considerable difficulty. That the former stands upon a more solid foundation, than the mere assertions of the proprietaries and their agents, and the credulity of the settlers and of the neighbourhood, is rationally to be inferred. This reputation must have originated in some act of public notoriety, or it would soon have sunk into oblivion. The defendants' counsel have attempted to account for a circumstance, which it is admitted is involved in no small degree of mystery, by supposing that an intermediate survey must have taken place, between the year 1722 and the years 1734 or 1736, when

those putative boundaries were first brought into notice. But such a presumption is opp:sed by arguments which are almost irresistibly conclusive. If there ever existed such a survey, it may fairly be asked what has become of it, and of the warrant to authorise it. It is expecting too much of the court. to support such a presumption by another, that these documents have shared the fate of the survey of 1722. But the truth is, that this presumption is repelled by facts of the most persuasive influence. For, not only is there no evidence to countenance this presumption. but we have not even a dictum of the proprietaries or of their agents to support it; neither the commission to Blunston, in 1733, nor his licenses point at such a survey. But on the contrary, Thomas Penn, in the licenses granted by him in 1736, refers expressly to the surveys made on the 19th and 20th of June 1722, as descriptive of the boundaries of this manor. No notice of a posterior survey, is taken in the commission issued in May 1754, to Robert Hunter Morris, the lieutenant governor of th: province, in which the manor referred to. and the warrant of re-survey issued by Governor Hamilton in 1762, which is not sparing in its recitals, refers altogether to the survey of 1722, the licenses granted by Thomas Penn in 1736, and the well known settlements and improvements, made by the said licensed settlers and others on and adjoining the manor, as proving the actual boundaries of the manor.

It appears to the court, that the only rational mode of solving the difficulty is, by supposing that the lines of the survey, but particularly of the first, were not actually measured in 1722, but were guessed at, and that little more was done, than to run the courses and to fix the corners. The short period of time in which the work was accomplished, although not affording positive proof of this fact, is sufficiently strong to countenance this supposition. That the courses were run, particularly of the first and third lines, is fairly to be inferred from the circumstance, of their strict agreement with the same or corresponding lines, as laid down in the survey of 1768. But, before this supposition can be admitted as warranting conclusions upon which it would be safe to found an opinion. it will be proper to consider, first, whether the evidence in support of it, is sufficient for the purpose; and, secondly, whether the validity of such a survey is liable to any serious objection.

First. No gentleman of the profession, who is at all conversant with land trials, can be ignorant, that the courses and distances laid down in a survey. especially if it be ancient, are never in practice considered as conclusive, but, that on the contrary, they are liable to be materially changed by oral proof, or other evidence. tending to prove that the documentary lines are those not actua'ly run. How often have we known reputed boundaries, proved by the testimony of aged wit-nesses, and even by the hearsay evidence of such witnesses, established in opposition to the most precise calls of an ancient patent. Such evidence has been constantly received, and distances have been lengthened or shortened, without the slightest regard to the calls of the patent. The reason is obvious. It is not the lines reported, but the lines actually run, by the surveyor, which vests in the patentee a title to the area included within these lines. The survey returned, or the patent. is the evidence of the former; natural marks or reputation is in almost all cases, the evidence of the latter. The mistakes committed by surveyors and chain carriers, more particularly in an unsettled country and wilderness, have been so common, and are so generally acknowledged, as to have given rise to a principle of law, as well settled as any which enters into the land titles of this country, which is, that, when the mistake is shown by satisfactory proof, courts of law, as well as courts of equity, have looked beyond the patent to correct it. It will be readily admitted, that such evidence should be cautiously received, if it should have a preponderating influence in determining the question of boundary. Subsequent locators, look in the first instance, to the survey as made and returned. for a demarkation of the tract, with which they must not interfere. · But, if a mistake is apparent upon the face of the survey, taken in connection with the natural and artificial marks on the ground, if the reputation of the neighbourhood, has assigned to the tract of land, so surveyed, boundaries different from those delineated on the survey returned. a subsequent location is so far affected by notice of the real boundaries of the tract on which it would adjoin, that a claimant under it cannot, even in a court of equity, set up his posterior equitable title, against the legal, or equitable title of the first locator. In short, he cannot assert that he was a purchaser without notice, in the face of strong evidence to the contrary.

Let us next consider the nature of the testimony, rested on to establish the reputed boundaries of this manor. Suppose, that the persons who received grants from Thomas Penn in 1736, and others, who claim under warrants to agree for lands acknowledged to be within the manor of Springetsbury, according to its reputed boundaries, were now in life, and upon their examination in court, should testify, that the boundaries of the manor were always understood to be those laid down by the survey of 1768, with the exception of that part bordering upon the southern line, excluded by the latter survey; who could doubt, that the survey of 1722 corresponded with those reputed boundaries? Upon what other foundation could such a reputation be built, than that of a demarkation. in some way or other. made, so as to become notorious in the neighbourhood of this manor? An opinion so generally enter-

tained, can be accounted for only upon the supposition, that those were known to be the boundaries of the manor, as actually run by the surveyor, or as designated upon the plot returned by him; and, which it is reasonable to presume, was carefully examined by those who felt an interest in understanding it before it was lost. The court, it is true, have not the benefit of this testimony, but is not this defect more than supplied by the acts of those persons? They received grants of land within the manor of Springetsbury, and by their locations, designated the boundaries of the manor, as they were subsequently laid down by the survey of 1768. Is it to be credited, that men who stipulated for grants of lands to lie within this manor, and who had previously settled on the land at the hazard of incurring the heavy penalties of the law, if they did not confine themselves within the boundaries of the manor lines, would be satisfied with any thing short of the most positive evidence of the real boundaries of the manor? This was the case of all those who received licenses from Blunston, and certificates from Thomas Penn, who we are informed by the preamble to the last mentioned document, had formerly seated themselves, by leave of the proprietaries, within the bounds of the manor of Springetsbury, surveyed the 19th and 20th of June 1722, and consequently at a period antecedent to the Indian cession, when it was criminal for any person to settle on the territorial or public lands, lying within the Indian limits. As little can it be believed, that in the year 1741, the surveyor would have been directed to lay off a tract of land, within the manor, for the site of York-Town, and that it would have been so surveyed, upon a mere imagination that the western line of the manor extended beyond the tract so located. In short, whenever the proprietaries or settlers have spoken or acted in reference to this manor, they have furnished evidence confirmatory of the recitals in the warrant of 1762, in relation to its boundaries as established by the survey of 1722.

Second. The plaintiffs' counsel, assuming as a fact, what the court is ready to admit, that the lines of the manor were not actually measured and marked on the ground, have contended, that the survey was for this reason void. Under this head they have also insisted, that it was void because the warrant was not directed to the surveyor general, and because it was not returned into the land office.

The obvious answer to these objections is, that the rules of the proprietaries' land office were established for the purpose of enabling individuals to appropriate lands offered for sale, with the least possible inconvenience, and to avoid the confusion which might otherwise arise, among conflicting locators: but, that neither in their terms or designs, were they applicable to

the proprietary, the paramount lord of the whole soil. He had confined himself by no contract, and he was bound by no law, to appropriate to his private use such tracts of land as he might please to reserve, in any particular form; or by the agency of any particular person. It is true that the successive proprietaries were in the habit of issuing a general warrant to the surveyor general, to lay off the tenths which they had reserved for their private use; and that the surveys of tenths and manors were usually, possibly invariably, returned into the land office. But, if they chose to depart from this customary form established by themselves for their own convenience, and to authorise any private individual to make those surveys, and to return them into any other public office than the land office, the court has yet to learn, by what laws the surveys so made and returned were invalidated. Neither has any law or usage been pointed out, by which a survey was deemed invalid, because the lines were not measured and marked on the ground. Third persons, are no otherwise concerned in relation to these matters, than as their rights might be affected by the want of notice of such prior appropriation, a reason which cannot, with any propriety be urged by the complainants, against the validity of the survey of 1722. A more general objection however has been made, to this survey, which may as well be noticed under this head. It is said Sir William Keith had no authority to issue the warrant under which this survey was made, and consequently, that every thing done in execution of it is void. Whether the governor had or had not such authority, is more than can be confidently affirmed by any person at this day, with the little light afforded by the evidence given in the cause. That he did possess it, is fairly to be presumed from the subsequent recognition of the proprietaries; and it is not to be questioned, but that such a recognition, upon a well established maxim of law, is to every intent and purpose equivalent to an original grant of authority.

Upon the whole, the opinion of the court is, that the survey of 1722, ought to be considered as having been made according to the reputed boundaries of the manor of Springetsbury, as laid down in the map or diagram which was given in evidence in the cause, with the exception of that part on the southern line, which was not included in the survey of 1768; and that all subsequent purchasers and settlers, are bound to take notice of these boundaries.

Secondly. As to those who purchased expressly within the manor, or upon condition not to interfere with it; or who took warrants to agree, and the like: their cases will now be considered. The following is an examination of the particular claims of each class.

First. The first class of cases embraces such of the plaintiffs as claim under licenses granted by Blunston, and the title of P. Springle, is exhibited as an example of such of the titles as come within this class. On the 6th of April 1734, Blunston, under a commission to him of the 11th day of January 1733, granted to M. Springle, 500 acres, in Manchester and Codorus townships, on the west side of Susquehanna. This grant is recited in the warrant of acceptance, dated 8th May 1769, which also recites, that by the death of M. Springle, the title to said land, and also to the land taken up by virtue thereof, became vested in his sons Peter and Michael; that under said grant, 606 acres were surveyed, as appears by a re-survey according to the old lines, on the 1st of May 1767; and that by said re-survey, 405 acres were laid off for Peter, and 201 for Michael; and that the said Peter had applied for a warrant of acceptance of his part, on his paying the purchase money of £15 10s. per 100 acres for the said tract, with interest and quit rents, commencing on the 1st of March 1742. The warrant then proceeds to require the said survey to be accepted and return thereof made, in order for confirmation on the terms aforesaid. The title is then regularly deduced to the plaintiff P. Springle.

Second. Under this class is exhibited the cases of George Beard, and Caleb Kirk, each of them claiming under what has been denominated grants from Thomas Penn, bearing date the 30th of October 1736, the general nature of which has been already stated. The former claims under a grant to C. Strickler, one of the fifty-two persons mentioned in the list of Thomas Penn's licenses, for 350 acres; and the latter claims under a similar grant to Killian Smith, (another of the persons mentioned in the said list,) for 200 acres. On the 30th of January, 1767, a warrant of acceptance was issued by John Penn, which recites the license, dated the 30th of October, 1736, to Charles Strickler for 350 acres, which he had settled within the manor of Springetsbury, to be surveyed and confirmed to him on the then common terms; that it being represented by Jacob Strickler, that Charles Strickler procured a survey of 378 acres 135 perches, to be made in virtue of the said grant, and had by deed dated the 29th of July, 1766, granted to the said Jacob, 182 acres 95 perches, by metes and bounds, being part of the said 378 acres 135 perches, of which part he had procured a survey to be made, and having paid the purchase money, interest and quit rents due for the same, had requested a warrant of acceptance, which was accordingly granted. The title to this tract of land, not being deduced lower down than to Jacob Strickler, no decree can be made in relation to it, favourable to the plaintiff, unless the links, which are missing in the chain of title, can be supplied before the final decree. But the title of Beard to 196 acres, the residue of the grant to Charles

Strickler, is fully made out, with the exception of the release from the co-heirs of Ulrick Strickler to him, which in his deed to Beard was stated to have been recorded, and may without doubt be produced on the final hearing. The claim of Kirk, is to 245 acres, being part of a survey for 429 acres 105 perches, made upon a grant of Thomas Penn to Killian Smith, of 200 acres. There is no objection to the regularity of his title.

Third Class. Under this class, the titles of Andrew Rutter, and George Leitner, have been adduced as examples. On the 13th of January, 1747, a warrant was issued, under the signature of the president of the land office, to survey for John Smith, 300 acres, including his improvement in Manchester township on the west side of Susquehanna, for which he agrees to pay £15 10s. per 100 acres with interest, and the yearly quit rents of a half penny sterling per acre, to commence on the 1st of March, 1757. Under this warrant, there was surveyed on the 18th of October, 1748, the quantity of 321 acres, the title to which, is regularly brought down to the plaintiffs Rutter and Leitner.

Fourth Class. The example under this class is Christian Stoner, who claims 145 acres 25 perches, under a warrant bearing date the 13th of April, 1763, granted to Hugh Patten for 255 acres, lying in Hallam township, provided it do not interfere with the manor of Mark of Springetsbury, or any other of the appropriated lands of the proprietary, the said Patten agreeing to pay £9 per 100 acres, and also the yearly quit rents of a penny an acre. Under this warrant there was surveyed in the same year, the quantity of 363 acres, besides 79½ acres to George Snallus, included. The title to the quantity claimed by Stoner is regularly deduced.

Fifth Class. Jacob Strickler is brought forward as representing such of the complainants as claim under applications for warrants. The title in this case commences with a certificate of survey, bearing date the 19th of May, 1767, made for Daniel Piedler, containing 89 acres 130 perches in Hallam township, on an application dated the 29th of December, 1766, No. 2255. On the 14th of March, 1755, Piedler paid fifty shillings in part for 50 acres of land to be surveyed to him, adjoining his other land in Hallam township. On the 5th of April, 1784, Steiner and Fitz, executors of Daniel Beither, (reciting a warrant dated 14th of March, 1755, under which was surveyed for him 91 acres in Hallam township, and also an application of said Beither, No. 2255, for 50 acres in said township dated 26th of December, 1766, under which there was surveyed for him, another tract, adjoining the above containing 37 acres,) conveyed both tracts to Henry Strickler, and on the 5th of April, 1784, Henry Strickler conveys to Jacob Strickler, 89 acres, being part of a tract conveyed by Steiner and Fitz. executors of Beither, to the said Henry Strickler by deed dated the 5th

instant. On the 1st of April, 1807, Henry Strickler by a deed, reciting the above mentioned conveyances, granted to Jacob Strickler ofher tracts of land, one containing 45 acres, another containing 73 acres 20 perches, another containing 106 acres, and one other containing 25 acres, 40 perches, amounting in the whole to 249 acres 60 perches. But it is impossible to discover, from the title papers before the court, whether the land surveyed under the application, No. 2255, which it is presumed is the land in question, is amongst the tracts conveyed by Henry to Jacob Strickler. Unless this matter is agreed by the parties, the court will refer it to the master commissioner to report upon it, in order that either party may have an opportunity to except.

Sixth Class. The last class of cases, embraces those who claim under settlement and improvement rights, without other title, and the case of the widow Tryckler and Jacob Strickler, are stated as the examples. As to the former, it may be sufficient for the present to observe, that the papers with which the court have been furnished, do not bring down the title regularly from Knab, the first settler, to these plaintiffs, and therefore it may be necessary to refer this title also. The same objection does not exist against the title of Jacob Strickler, who claims under a settlement and improvement made by one Bassett, as long ago, as the year 1758, from whom, by mesne conveyances, the title became vested in the plaintiffs. The settlement and improvement, is fully proved in both these cases, that of Knab being fixed as early as the year 1753.

Having thus stated the legal title of the proprietaries to the manor of Springetsbury, and the asserted equitable titles of the plaintiffs, or such of them as have been laid before the court, it becomes proper to consider the two questions which immediately present themselves.

First. Whether these plaintiffs, or any and which of them, are entitled to conveyances of the legal estate, which it is admitted by their counsel is vested in the defendants, and is not now to be called in question? And, secondly, Upon what terms such decrees ought to be made?

First. Peter Springle. Whether Blunston's licenses extended to the manor lands or not, need not be decided, since the only claimant under his license, who is before the court, has had his survey accepted. There can therefore be no question but that this plaintiff is entitled to a conveyance of the legal estate, upon such terms as may hereafter be decided to be equitable, when the court comes to the consideration of the second point.

Second. George Beard and Caleb Kirk. The equitable title of these plaintiffs is not, and cannot be questioned. By the express terms of their grants, they were to lie within the manor, and they purchased upon the

common terms on which other lands on the west side of the Susquehanna, were granted. It will be unnecessary to examine the remaining cases separately, since they all come within the operation of the same principle. These plaintiffs are to be considered in the light of purchasers with notice of the reputed boundaries of the manor, under the survey of 1722, and this principle applies a fortiori against those whose title commenced subsequent to the warrant of survey. Being purchasers with notice, they have no equity to demand conveyances.

Second. The next question is, upon what terms are such of the plaintiffs, as have equitable titles to the lands they respectively claim, entitled to a decree for the conveyance of the legal estate.

Under this head the following points have been raised by the counsel for the plaintiffs: First. That they are entitled to a conveyance of all the surplus land, within their respective surveys, upon the same terms with those that may be legally demanded of them for the quantity expressed in their warrants, Second. That they are entitled to an abatement of interest. 1st. On account of the disturbances occasioned by the controversy with Lord Baltimore, and the consequent incursions of the borderers claiming under Maryland, during the continuance of these disturbances. 2d. On account of the Revolutionary and late war with Great Britain, and during the continuance thereof.

First. That it has always been customary in Pennsylvania to include in the survey of the common, or territorial lands, a greater quantity than the warrant specified, and to pay the same price for the excess; which is admitted on both sides. The toleration of such a practice by the proprietaries and their agents, was entirely consistent with the great object they had in view, of settling the province as rapidly as could be effected, and of raising from the lands the greatest possible revenue; and although about the year 1764, some attempts were made by the governor of Pennsylvania, to limit the excess to ten per centum, yet the practice of comprehending a larger quantity, had become so inveterate, that subsequent relaxations of these orders were found necessary. But it is also contended, that a similar custom prevailed in respect to the manors and other reserves of the proprietaries; to establish which custom, the following evidence is relied upon. Twenty cases are cited, in which it appears that the surplus was settled for, upon the same terms with those exacted for the quantity granted. Upon these cases the court deem it proper to make the following observations. Four of them only, viz. Spangler, Seigler, Worley and Comfort, appear to relate to lands not lying within any of the proprietaries' reserved lands. Two others state expressly, that the grantees are to comply with the proprietaries' demand, without any limitation whatever; of the remainder of the

cases, four are of lands lying in Hallam township. one in Manheim township, two in York county, and in three neither county nor township is mentioned. It was stated at the bar, that Hallam township lies within the manor of Springetsbury, but whether the fact be so or not, was not proved, and even if it had been, the complainants would have had but eight cases to establish the existence of this alleged custom.

In opposition to the cases relied on by the plaintiffs to prove this custom, the defendant produced a number, in which the surplus land was paid for at a much higher price than for the quantity granted; and amongst these, eight of them are stated expressly to lie within the manor. These are quite sufficient to defeat the alleged custom, as applicable to manor lands; and they leave the court necessarily to draw the conclusion, that in the few instances in which it appears, that the quantity surveyed was disregarded, the proprietaries did so from mere favour, or from other considerations, which it is impossible at this remote period for us to penetrate. To establish a custom, so full of absurdity, because so inconsistent with any imaginable motive which could influence the proprietaries to withdraw certain portions of land from the public stock, and appropriate them to their private use, the evidence ought to be clear, strong and uniform. The settlement of the lands surrounding these reserves, could not fail in a short time to enhance the price of the latter, and consequently increase the value of the reserves of the proprietaries. Partial settlements within the manors, would tend still further to produce this effect: but if a license to make such settlements, however limited in its extent, so as to meet the calculations of the proprietaries, could have authorised an extension of the privilege at the will of the grantee, it is most obvious, that such reserves would be merely nominal, or that the proprietaries would be deprived of all the advantages to which they were entitled, of permitting for their own advantage, partial settlements, within their manors.

Second. Abatement of interest.

First. On account of the inroads of the borderers claiming under Maryland. Candour, we think, must admit, that there is not such evidence laid before the court, as would warrant us in deciding upon any general principle, that this claim ought to be allowed. That an irregular and partial state of hostility existed at certain periods, and to a limited extent between the settlers under the two proprietary governors of Pennsylvania and Maryland, is a matter of general history; but that any one of the persons under whom these complainants claim, was at any period disturbed or driven from his farm, is not proved, or even asserted. Even if it were proved, that one or more of them had been so disturbed, how could such a case influence any other to

which similar proof did not apply. We think that the reasons urged by Mr. Thomas Penn in his letter to Mr. Peters, of the 12th of February, 1762, against this claim, are replete with so much good sense, that we hesitate not to adopt them. After consenting, obviously as a matter of favour, to abate interest and quit rents due upon the lands which Mr. Peters had purchased from improvers within the manor, from the year 1755, when the devastations commenced, to the year 1762, he observes "with regard to other people, we propose to forgive interest and quit rents to such as have been disturbed and obliged to go off their plantations or have had their cattle killed, or their houses, or out-houses burned, from that time to the time when they might return in safety; but not to the settlers in general, many of whom kept their settlements, and by their situations have got estates, having sold the produce of their plantations and let their waggons at great prices." For what reasons he charged quit rents and interest, from a period subsequent to the grant of title, it is impossible for this court to conjecture; possibly there may have been circumstances of equity, known to the proprietary, which induced him to grant the indulgence. Those persons may have been disturbed in their possessions, by the Maryland intruders, and may have sustained losses, so as to bring their cases within the terms of the indulgence held out in the above letter. It may have been granted in consideration of the payment of the principal, at the particular period when it was received, and without exposing him to the trouble and expense of law suits. But these abatements were irregular in their extent, and prove that no usage on the subject existed, and that no general principle was established applicable to all cases. Surely the present complainants, upon the mere ground of a favour, come with a bad grace into a court of equity, to ask an extension of it to them.

The second claim is of an abatement of interest during the Revolutionary and late war. This question has never been decided, it is believed, in the supreme court of the United States. We know not what have been the decisions in the different circuit courts, and in the state courts, not having access to any of the ordinary means of information, except such as the Pennsylvania and Virginia reports furnish. In those states, the law seems to be settled, that where the creditor was absent during the war, and had no known agent within the United States, interest, during the war, should be deducted. It would appear, from the justly celebrated answer of Mr. Jefferson to Mr. Hammond, that interest during the war had been disallowed in some of the state courts, and allowed in others. This court, finding itself unshackled by authorities, is left to form its opinion of this question upon general principles, and we feel no hesitation in de-

ciding, that the mere circumstance of war existing between two nations, is not a sufficient reason, for abating interest upon the debts due by the subjects of the one belligerent to those of the other. It is admitted, that wars in their mildest form are productive of great national calamity to both belligerents, and especially to that one which happens to be invaded. If this were per se, a reason for abating interest, it would operate with equal force, whether the creditor were a fellow citizen of the debtor, an enemy, or the subject of a foreign friendly government.

A prohibition of all intercourse with an enemy, during the war, and the legal consequence resulting therefrom, as it respects debtors on either side, furnish a sound, if not in all instances, a just reason for the abatement of interest, until the return of peace. As a general rule, it may safely be laid down, that wherever the law prohibits the payment of the principal, interest during the existence of the prohibition is not demandable; and no reason is perceived, why the rule should not be the same in courts of equity, as in courts of law. But, the rule can never apply in cases where the creditor, although a subject of the enemy, remains in the country of the debtor, or has a known agent there, authorised to receive the debt; because the payment to such creditor or his agent, could in no respect be construed into a violation of the duties imposed by a state of war, upon the debtor. The payment in such cases is not made to an enemy, and it is no objection, that the agent may possibly remit the money to his principal; if he should do so, the offence is imputable to him, and not to the person paying him the money. As the evidence upon the point to which the exception to the general rule applies, was not as full as it ought to have been, and possibly is susceptible of being made, the parties on each side will have an opportunity before the auditor, to produce evidence to show, whether during the Revolutionary and the late war, or for any and what part thereof, the proprietaries had in the United States, a known agent, or agents, authorised to receive the purchase money and quit rents, due to them from the complainants.

The court, in giving the above opinion, has taken no notice of the agreement of compromise, offered by the defendants to the complainants in 1804, because then, and even at the hearing of the cause, it was rejected.

### Decree.

This cause came on to be heard, at the last session of the court, upon the bill, answer, replication and exhibits, and the oral examination of witnesses, and was then argued by counsel; whereupon the court having taken time to consider of the same, are of opinion:

First. That Peter Springle, and such of the complainants as claim under licenses issued by Samuel Blunston, whose surveys have been accepted, are entitled to conveyances, for the quantity of land mentioned in their licenses, upon their paying therefor the principal sum due by the terms of the license or warrant, with interest and quit rents from the date of the license, subject, as to the interest, to the decision which the court may hereafter make on that subject.

Second. George Beard, (in case his title should be regularly deduced down to him,) Caleb Kirk, and such of the complainants as claim under licenses or grants from Thomas Penn, in 1736, or whose warrants express that the land is to be within the manor of Springetsbury, or who claim under warrants to agree, are entitled to conveyances of the quantity of land mentioned in their respective grants, licenses or warrants, on the payment of the sum mentioned in the same, with interest and quit rents from the date of the said grant, licenses or warrants, subject, as to the interest, as in the preceding case.

Third. Such of the complainants as do not come within the above description, have no equity, and the bill as to them, must be dismissed.

Fourth. In every case where a conveyance, according to the principles of this decree, is to be made, of the quantity of land mentioned in the warrant or other evidence of title, the surplus land ought always to be conveyed to such plaintiff, upon his paying the present value of such surplus, clear of the improvements; the quantity of such surplus to be laid off, and the said value to be ascertained, by commissioners to be appointed by the court, unless the parties can agree as to the said quantity and value. The court reserves the decision of the following point, until the evidence of the facts thereupon be exhibited in the report of the auditor or otherwise.

Fifth. It must appear, whether or not the defendants had a known agent, authorised to receive the monies due by the complainants or any of them, either for the whole or any part of the periods during the existence of the Revolutionary or late war; and if for any part, what portion of those periods, such agent or agents, was or were in the state for the purposes mentioned.

Whereupon, it is decreed and ordered, that such of the complainants, as according to the above principles are entitled to conveyances, do lay before the auditor of this court, abstracts of their respective titles, together with their title papers where the same are called for by the defendant, or required by the said auditor, who is directed to report the said titles, or such of them as may be disputed by the defendant. And it is further ordered and decreed, that the said auditor do state and report an account of the sums to be paid by the respective complainants, according to the principles above laid down; and for ascertaining facts material to the

said account, either of the parties to this cause are at liberty to take affidavits, upon reasonable notice to the adverse party, his attorney or solicitor, of the time and place of taking the same. And it is further decreed and ordered, that Edward Crawford of Franklin county, William Graydon of Dauphin county, John Boyd of Northumberland county, John Anderson of Bedford county, and Adam Reigart of Lancaster county, or any three of them, do ascertain and lay off the quantity of surplus land comprehended within the surveys of such of the complainants, as, according to the principles before stated, are entitled to conveyances, and that they do also appraise the said several portions of surplus land, according to their present value, exclusive of the improvements thereon, and make report of the same to this court; and to enable the said commissioners to execute this order, Samuel Baird and Peter Spangler are appointed to make the necessary surveys, under the directions of the said commissioners, and the parties are authorised to take affidavits, upon notice, as aforesaid, to enable the said commissioners to perform the duties assigned them.

[NOTE. Certain of the complainants refused to comply with the requirements of the decree as to the exhibition of proofs and appearance before the commissioners and on the coming in of the report the bill was dismissed as to them.
[From the decree of dismissal they appealed to the supreme court, which reversed the circuit court decree because of irregularity, in that it was made without the presence of the defendant William Penn. Conn v. Penn, 5 Wheat. (18 U. S.) 424.
[For the final disposition of this case and the rights of the several parties, see Case No. 3,-105.]